IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

PARK BANK,

                Appellant,

v.

U.S. BANK TRUST, N.A.,

                Appellee.

OPINION & ORDER

18-cv-89-jdp

---

This is an appeal of the bankruptcy court's grant of summary judgment in an adversary proceeding related to Vincent and Linda Hamilton's bankruptcy. During the bankruptcy, the Hamilton residence was sold under section 363. Appellant Park Bank and appellee U.S. Bank Trust, N.A., both held security interests on the property, and they dispute which of them is entitled to recover the net sale proceeds of $131,157.31.

Priority is complicated here. U.S. Bank is a successor to a lender who received mortgages on the Hamilton residence that were not immediately recorded. Park Bank's security interest was granted later but recorded first. Under Wisconsin's race-notice statute, Wis. Stat. § 706.08(1)(a), Park Bank might well have priority. But Park Bank had actual knowledge of the prior mortgages, because the Hamiltons had disclosed them to Park Bank. And on that basis, the bankruptcy court held that Park Bank was not entitled to the benefit of the race-notice statute and granted summary judgment to U.S. Bank.

Park Bank appeals. Park Bank contends that its actual knowledge of the prior mortgages would prevent it from gaining priority over only the original holder of those mortgages. But U.S. Bank, as the assignee of a later-acquired mortgage, is charged with knowledge of Park Bank's recorded security interest. Thus, the argument goes, Park Bank's

first-recorded security interest takes priority over the later-recorded mortgages that U.S. Bank now holds. This result is required, according to Park Bank, under principles of equitable subrogation, which the bankruptcy court did not consider.

This court concludes that Park Bank took a security interest knowing that its interest was subordinated to prior unrecorded mortgages, and that the principles of subrogation do not give it priority over subsequent mortgages that were granted to secure financing to pay off the Hamiltons' original debt. The judgment of the bankruptcy court is affirmed.

BACKGROUND

The essential history of the financing of the Hamiltons' residence, and the resulting security interests in that property, is undisputed.

Back in the 1990s, the Hamiltons built a house at what is now N1922 Summit Drive, La Crosse, Wisconsin. The property straddles two lots, which led to some complications that the bankruptcy court resolved. (Those complications are not material to this appeal, although they might explain some of the irregularities in the recording and discovery of the security interests involved.) The Hamiltons' construction loans were secured by a mortgage on the Summit Drive property. When construction was complete, they refinanced those loans with The Money Store (TMS) on November 20, 1998. Those loans were secured with two mortgages—one for $405,000 and another for $40,000. But, for unexplained reasons, The TMS mortgages weren't recorded until May 12, 1999.

In the gap between the granting of the mortgages to TMS and the recording of those mortgages, the Hamiltons sought financing from Park Bank to expand Linda Hamilton's chiropractic practice. The resulting Park Bank loan for $385,000 was secured not only by the

Hamiltons' business property, but also the Hamiltons' residence, as reflected in a Real Estate Security Agreement (RESA). Park Bank recorded the RESA on April 19, 1999, almost a month before the TMS mortgages were recorded. But critically, the Hamiltons disclosed the TMS mortgages in the Personal Financial Statements submitted to Park Bank in support of their loan applications.

The Hamiltons refinanced their debt to TMS with a $486,000 loan from Ameriquest Mortgage Company on January 21, 2004. The proceeds of that loan were used to satisfy the 1998 TMS mortgages and other debts. The Ameriquest loan was secured with a new mortgage on the Hamiltons' residence, which was recorded on February 2, 2004. The Ameriquest loan and mortgage were assigned, ultimately, to U.S. Bank on September 15, 2015, a few months after the Hamiltons filed their bankruptcy petition on July 8, 2015.

U.S. Bank filed an adversary proceeding seeking, among other things not material here, to establish its priority over Park Bank. On January 25, 2018, the bankruptcy court granted U.S. Bank's motion for summary judgment, holding that Park Bank had actual notice of the 1998 mortgages, and therefore U.S. Bank is "entitled to priority to the extent of the balances on the 1998 TMS Mortgages that were actually paid and refinanced by the Ameriquest Mortgage." Dkt. 1-1, at 7.

ANALYSIS

The court has jurisdiction over this appeal under 28 U.S.C. § 158(a)(1). The court reviews the bankruptcy court's grant of summary judgment de novo, as with all conclusions of law. *In re Midway Airlines, Inc.*, 383 F.3d 663, 668 (7th Cir. 2004). The familiar summary

judgment standards apply: summary judgment will be affirmed if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

Under Wisconsin's race-notice statutes, which the parties agree are applicable here, the date on which an interest is recorded in the title record generally determines its priority: the first mortgage recorded is superior to later-recorded mortgages, regardless of when the mortgages were actually executed. *See* Wis. Stat. §§ 706.08, 706.09; *In re Thulis*, 474 B.R. 668, 674 (Bankr. W.D. Wis. 2012). One exception to this general rule is actual notice: a party who actually knows about a prior but unrecorded interest cannot claim the benefit of the race-notice statute. *Id.*

On appeal, Park Bank does not challenge the bankruptcy court's conclusion that it had actual notice of the 1998 TMS mortgages and that therefore, the 1998 TMS mortgages have priority over Park Bank's RESA. Rather, it challenges the bankruptcy court's conclusion that U.S. Bank's mortgage—or at least the portion of the mortgage that refinanced the 1998 TMS mortgages—is also superior to Park Bank's RESA. The bankruptcy court did not fully explain how it reached the conclusion that U.S. Bank effectively stood in the shoes of TMS. Remember that U.S. Bank did not acquire the TMS mortgages; it acquired the Ameriquest mortgages, which were granted to secure a loan that was used to pay off the TMS debt and other debt.

The parties agree that the only way that U.S. Bank's mortgage could receive the same priority as the 1998 TMS mortgages is through application of subrogation, an equitable doctrine applied when "a person other than a mere volunteer pays a debt which in equity and good conscience should be satisfied by another." *In re Trampush*, 552 B.R. 817, 821 (Bankr. W.D. Wis. 2016) (quoting *Rock River Lumber Corp. v. Universal Mortg. Corp.*, 82 Wis. 2d 235,

4

262 N.W.2d 114, 116 (1978)). There are two varieties of subrogation—conventional subrogation and legal or equitable subrogation. *See Am. Ins. Co. v. City of Milwaukee*, 51 Wis. 2d 346, 187 N.W.2d 142, 145 (1971).

The parties agree that conventional subrogation, which rests essentially on contract principles, would be applicable here. "Under conventional subrogation, 'a lender will be granted subrogation where money is advanced in reliance upon a justifiable expectation that the lender will have security equivalent to that which his advances have discharged, provided that no innocent third parties will suffer.'" *Trampush*, 552 B.R. at 821 (quoting *Rock River Lumber*, 262 N.W.2d at 117). Refinancing a mortgage is a prototypical situation in which conventional subrogation would apply, allowing "one who has paid off another's mortgage obligation [to be] treated as the owner of that obligation." *Countrywide Home Loans, Inc. v. Schmidt*, 2007 WI App 243, ¶ 1, 306 Wis. 2d 200, 742 N.W.2d 901. It seems clear that the bankruptcy court applied the doctrine of conventional subrogation in deciding that U.S. Bank stood in the shoes of TMS, even though it didn't expressly say so.

"The remedy of subrogation is highly favored, and the courts are inclined to extend rather than to restrict the principle, and to give it a liberal application." *Jindra v. Diederich Flooring*, 181 Wis. 2d 579, 511 N.W.2d 855, 861 n.11 (1994). But the party requesting subrogation has the burden of proving its right to subrogation, *id.* at 861, and "conventional subrogation will be available only where a definite agreement of the parties is shown and where a balancing of the equities favors application of the doctrine." *Rock River Lumber*, 262 N.W.2d at 242. This court is satisfied that U.S. Bank has shown the requisite agreements of the parties: Ameriquest refinanced the Hamiltons' debts, including the debt to TMS. Funds from the Ameriquest loan were used to satisfy the TMS mortgages and Ameriquest took a

new mortgage as its security on the loan it made. And by a series of assignments, U.S. Bank paid off the Ameriquest loan and took Ameriquest's security position.

But the bankruptcy court did not walk through the equities (and disclaimed the need to consider equitable subrogation, Dkt. 1-1, at 8). On this basis, Park Bank contends that the grant of summary judgment was erroneous. This court could remand the matter to the bankruptcy court to consider the equities in the first instance, if the facts could support a different outcome. But the parties conceded in the bankruptcy court that all the material facts were of record, and the bankruptcy court could decide the issue as a matter of law. Dkt. 1-1, at 1-2. Based on the undisputed facts of record, this court concludes that the balancing of the equities favors the application of conventional subrogation for U.S. Bank.

Park Bank's core argument is that even though it is not entitled to the benefit of the race-notice statue against TMS, it should be entitled to the benefit of the race-notice statute against Ameriquest and its successors. This is because Ameriquest should have known when it refinanced the Hamiltons' debt in 2004 that the Hamilton residence was subject to Park Bank's RESA. The Park Bank RESA was recorded in 1999, providing constructive notice to anyone who might take the Hamilton residence as security for any later loan. Of course, the Hamiltons thought that they were refinancing a first-position mortgage, so it might be understandable if Ameriquest thought so, too. Nevertheless, the court agrees that Ameriquest should have checked for recorded security interests, and that it is charged with knowledge of those security interests.

But here is where the equities tip against Park Bank. What if Ameriquest had checked for recorded security interests? Would Ameriquest have refinanced $486,000 of the Hamiltons' debt with a second-position mortgage? Very unlikely. Ameriquest would have

6

sought to clarify that it was taking a first-position mortgage and that Park Bank's mortgage was subordinate to it. But would Park Bank agree to subordinate? Most likely; it had already done so when it made the business loan to the Hamiltons knowing that the residence was already subject to the TMS mortgages. After all, the residence was only part of the collateral for the Park Bank loan, which was also secured by the Hamiltons' business property. Everyone would have gotten what they bargained for. But if the court were to deny U.S. Bank's claim for subrogation, then Park Bank would get a windfall because it would step up to a first-position security interest when all it bargained for was an interest subordinate to the Hamiltons' primary home mortgages.

The equities favor the application of conventional subrogation to U.S. Bank's interest in the Hamilton residence to the extent of the original TMS mortgages. The court has considered Park Bank's arguments based on the language of the Ameriquest documents and Ameriquest's purported negligence and finds them unpersuasive in light of the broader context of the transaction.

ORDER

IT IS ORDERED that the final decision of the United States Bankruptcy Court for the Western District of Wisconsin granting appellee U.S. Bank Trust, N.A.'s motion for summary judgment is AFFIRMED.

Entered August 17, 2018.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge